**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

**Case No**.: 1:24-cv-24072-KMW

GUIDO ANTONIO ABREU,

         Plaintiff,

v.

LEXISNEXIS RISK SOLUTIONS INC.,
PROGRESSIVE AMERICAN INSURANCE
COMPANY,

         Defendants.

**JURY TRIAL DEMANDED**

## SECOND AMENDED COMPLAINT

Guido Antonio Abreu ("Plaintiff") brings this action on an individual basis, against LexisNexis Risk Solutions Inc. ("LNRS") and Progressive American Insurance Company ("Progressive") (collectively "Defendants") for actual, statutory, and punitive damages and costs, and attorney's fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et. seq.*, arising out of LNRS' mixing Plaintiff's file with another consumer.

## INTRODUCTION

1.     The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the LNRS acknowledges this potential for misuse and resulting damage every time it sells its claims history services to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.      Since 1970, when Congress enacted the FCRA, 15 U.S.C. § 1681, *et seq.*, federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.      "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies." *Burke v. Lexis Info. Sols., Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

7.      Congress made the following findings when it enacted the FCRA in 1970:

(a)      The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking

*Guido v. LexisNexis Risk Solutions Inc. et al.*
Second Amended Complaint

> system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.
>
> (b)  An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.
>
> (c)  Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.
>
> (d)  There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a)(1-4).

8.    Thus, one of the fundamental purposes of the FCRA is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter." 15 U.S.C. § 1681(b). Accordingly, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

9.    The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

10.     Since 1970, when Congress enacted the FCRA, as amended, 15 U.S.C. § 1681 *et. seq.*, the federal law has required CRAs to have in place and to utilize reasonable procedures "to assure the maximum possible accuracy" of the personal and financial information that they compile and sell about individual consumers.

11.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or his credit and obtaining new credit.

12.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

13.     The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

14. A recurring and *known* issue within the credit reporting industry is the creation of "mixed files."

15. A "mixed file" occurs when personal and credit information belonging to Consumer B appears in one or more of Consumer A's credit files.

16. "Mixed files" create a false description and representation of a consumer's credit history.

17. The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is subject to that Consumer Report." *F.T.C. v. TRW, Inc.*, 784 F. Supp. 361, 362 (N.D. Tex. 1991).

18. Mixed files are not a new phenomenon. LNRS has been on notice of the existence of mixed files, and the fact that its procedures for creating consumer files, including its matching algorithms, are prone to frequently cause mixed files, for over thirty (30) years. *See Thompson v. San Antonia Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

19. More recently, LNRS has been the subject of numerous state attorney general actions relating to its mixed file problem.

20. For example, in 2015, the New York Attorney General filed charges and settled claims with other CRAs over mixed files.[1] *See In the Matter of Eric T. Schneiderman, Attorney General of the State of New York v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC.*

---

[1] https://ag.ny.gov/press-release/2015-ag-schneiderman-announces-groundbreaking-consumer-protection-settlement-three Last visited May 17, 2022; *see also* https://ag-ny.gov/pdfs/CRA%20Agreement%20Fully%20Executed%203.8.15.pdf Last visited May 17, 2022.

21.     Notwithstanding LNRS' notice and being subject to repeated enforcement actions, mixed files continue to occur despite consumers' unique personal identifying information, such as Social Security numbers, date of birth, and addresses.

22.     Another consequence of mixed files is the resulting disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge or consent, or both. This occurs when a consumer's file is mixed with that of another consumer, and either of those consumers applies for credit, housing, insurance, or employment, and LNRS sells information pertaining to one consumer in response to the application of the other.

23.     LNRS has been sued thousands of times wherein an allegation was made that LNRS violated the FCRA. Moreover, LNRS is sued, at a minimum, hundreds of times each year wherein an allegation is made that LNRS mixed a consumer's file with that of another consumer.

24.     FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who fall victim to a mixed credit file.

25.     For example, in 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case NO. 00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them despite Ms. Thomas' numerous disputes. The jury awarded Ms. Thomas $300,000.00 in actual damages and $5,000,000.00 in punitive damages.

26.     In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000.00 in actual damages and $2,700,000.00 in punitive damages for willfully violating the FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes.

27.     In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000.00 in actual damages and more than $18,000,000.00 in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them despite Ms. Miller' numerous disputes.

28.     More recently, a jury assessed a $60 million dollar verdict against Trans Union for mixing innocent persons as terrorists and drug dealers by matching consumers with the Office of Foreign Asset Control's "terrorist alert" list based on first and last name alone. *See Ramirez v. Trans Union, LLC*, No. 12-CV-00632-JSC, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), *aff'd in part, vacated in part, rev'd in part sub nom. Ramirez v. TransUnion, LLC*, 951 F.3d 1008 (9th Cir. 20020).

29.     "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong evidence is required to cure the defendant's disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA). Moreover, repeated noncompliance with statutory duties can establish that the defendants acted willfully. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

30.     No less than three federal Courts of Appeal have held a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

31.     Notably, the Federal Trade Commission has specifically warned consumer reporting agencies, including LNRS, to review their procedures when a mixed file occurs.

32.     Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed files remain a significant problem for innocent consumers, including Plaintiff.

33.     Plaintiff's claims arise out of LNRS' blatantly inaccurate insurance claims history reporting, wherein LNRS published in a consumer report about Plaintiff the information of another consumer because LNRS mixed Plaintiff's insurance claims file with that of an unrelated consumer.

34.     Further, Plaintiff's claims also arise out of LNRS' blatantly inaccurate insurance claims reporting, wherein LNRS permitted the impermissible access to Plaintiff's credit file when it published a consumer report about Plaintiff in response to an insurance claim submitted by and pertaining to an unrelated consumer because LNRS mixed Plaintiff's insurance claims file with that of an unrelated consumer.

35.     Accordingly, Plaintiff brings claims against LNRS for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs insurance claims reports, in violation of the FCRA, 15 U.S.C. § 1681e(b); and for failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and in fact, the product of a mixed file, and for failing to delete the disputed information from Plaintiff's insurance claims file, in violation of the FCRA, 15 U.S.C. § 1681i.

36.     Further, Plaintiff also brings claims against the Furnisher, Progressive, for failing to conduct a reasonable investigation to determine whether the information Plaintiff disputed did in fact belong to another consumer and for failing to delete the disputed information from Plaintiff's insurance claims file, in violation of the FCRA, 15 U.S.C. § 1681s-2b.

37.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendants for its willful and/or negligent violations of the FCRA, 15 U.S.C. § 1681, *et seq*., as described herein.

## PARTIES

38.     Guido Antonio Abreu ("Plaintiff") is a natural person residing in Miami, Florida, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

39.     LNRS is a corporation doing business throughout the United States, including the State of Florida and in this District, and has a principal place of business located at 1000 Alderman Drive, Alpharetta, Georgia 30005. LNRS can be served at its registered agent, C T Corporation System, located at 1200 South Pine Island Road, Plantation, FL 33324.

40.     LNRS is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). LNRS is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

41.     The information LNRS collects through their C.L.U.E. database, maintains, and sells includes confidential details about the name, date of birth and policy number in addition to claim details such as date of loss, claim type, amounts paid, fault details and vehicle information. LNRS also collects consumers' personal identifiers, such as Social Security Numbers ("SSNs"), telephone numbers, and addresses.

42.     LNRS collects and maintains such information about consumers, whether consumers like it or not. Consumers do not have a choice as to whether LNRS collects and maintains information about them. Not only that, but consumers cannot remove information that LNRS collects and maintains about them from the CLUE database. Further, LNRS sells that

information about consumers for its unilateral profit, none of which is shared with the Plaintiff, who is the subject of the very data that LNRS sold.

43.     Defendant Progressive American Insurance Company ("Progressive") is an Ohio Corporation with a principal place of business located at 6300 Wilson Mills Road, Mayfield, Ohio 44143, and is authorized to do business in the State of Florida, including within this District. Progressive can be served at its registered agent c/o Chief Financial Officer, 200 E. Gaines Street, Tallahassee, Florida 32399.

44.     Progressive is a "Furnisher" as defined in 12 CFR 1022.41.  Progressive regularly furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report.  A data furnisher, such as Progressive, is an entity that reports information about consumers to consumer reporting agencies ("CRAs"), which may include credit bureaus, tenant screening companies, check verification services, and medical information services, insurance claim history services, etc.  Like CRAs and data users, data furnishers have legal obligations and rules that must be upheld & followed pursuant to 15 U.S.C. § 1681s-2b of the FCRA.

## JURISDICTION AND VENUE

45.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

46.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## SUMMARY OF THE FAIR CREDIT REPORTING ACT

47.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

48.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports. Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

49.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

50.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

51.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

*Guido v. LexisNexis Risk Solutions Inc. et al.*
Second Amended Complaint

## LNRS' PROCESSING OF CONSUMER INFORMATION

52.     LNRS regularly receives information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, insurance companies, public information vendors, and others.

53.     These sources are known as "furnishers" within the credit and insurance claims reporting industry and under the FCRA.

54.     LNRS collects information from thousands of furnishers.

55.     The process by which LNRS receives, sorts, and stores information is largely electronic.

56.     LNRS takes insurance information reported by furnishers and creates consumer claims history files.

57.     LNRS maintains insurance claims history on more than 200 million consumers.

58.     Claims history files are updated electronically by the furnishers to reflect new information regarding the reported insurance claims.

## LNRS' MIXED FILE PROBLEM

59.     LNRS knows that different consumers have similar names.

60.     LNRS knows that different consumers can have similar Social Security numbers.

61.     LNRS knows that different consumers with similar names can also have similar SSNs.

62.     LNRS knows that public records often do contain identifying information such as SSNs or dates of birth.

63.   LNRS matches insurance claims and public records to a consumer file by comparing the information about the consumer associated with the insurance claim or public record to the information they maintain about the consumer in the consumer's files.

64.   LNRS accomplishes this matching of insurance claims information to consumer files through the use of certain matching algorithms or database rules.

65.   From time to time, LNRS' matching algorithms match information belonging to one consumer to the file of another consumer; resulting in what's commonly known as a mixed or merged file.

66.   Mixed files are not a new phenomenon. In fact, as long ago as the early 1990s, the Federal Trade Commission ("FTC") (the government agency charged with enforcement of the FCRA), entered into individual Consent Decrees with each of the major CRAs, specifically including LNRS, regarding its significant failures and deficiencies with respect to mixed files.

67.   Despite LNRS' long-standing and specific knowledge of the mixed file problem, Plaintiff's insurance claims report was still generated by LNRS; containing information belonging to another consumer.

68.   A mixed or merged file is the result of LNRS' inaccurately mixing personal identifying information and claims history and/or an entire insurance claim file belonging to one consumer into the insurance claims file of another consumer.

69.   There are many different possible causes for the mixing of consumer files but all of them relate in one way or another to the algorithms and/or database rules used by LNRS to match personal identifying information and consumer information, including public record information, to a particular consumers' file.

70.     The success or failure of these algorithms or rules is both a function of the rules themselves and of the information provided by the furnishers of the tradeline information to LNRS.

71.     A mixed consumer report could be caused by an improper algorithm just as it could be caused by the inaccurate reporting of a consumer's personal "indicative" information (e.g., name, Social Security number, address, date of birth, etc.) by the furnishers to LNRS.

72.     LNRS knows that data from furnishers is sometimes reported or entered inaccurately, processed poorly or incorrectly, and is generally not free from defect.

73.     The database rules determine which files are deemed reliable and selected by the algorithm and merged to create a complete consumer report.

74.     Therefore, a mixed consumer report is sometimes the result of the mixing of two or more consumer files belonging to different consumers into one consumer report.

## FACTUAL ALLEGATIONS

### Plaintiff is Falsely Reported as Having Been Involved in an Accident

75.     In or around April or May 2023, Plaintiff received a call from Defendant Progressive's claims adjuster asking if he was involved in an accident while operating a Toyota Corolla.

76.     Plaintiff let the claims adjuster know that he was not involved in any accident and does not own a Toyota Corolla.

77.     On or about May 11, 2023, Plaintiff renewed his car insurance with Progressive for $3,303 for 6 months, which was an increase of approximately $591 from his previous 6-month term.

78.     At the time of the renewal, Plaintiff did not know that the rate increase was due to any errors involving his driving history.

79.     However, in or around the beginning of June 2023, Plaintiff viewed his Progressive policy through their mobile application and discovered that he was listed as a driver on a separate policy ending in 2395 that was not his and that he did not recognize. Plaintiff's policy with Progressive ended in 9535.

**Plaintiff Disputes the Inaccurate Progressive Account**

80.     Upon discovering this error, Plaintiff immediately called and disputed the information with Progressive Insurance.

81.     Plaintiff specifically identified the Progressive Account ending in 2359 as not belonging to him.

82.     Along with the phone call, Plaintiff sent Progressive a copy of his driver's license, and all the necessary documentation to support his dispute.

83.     Plaintiff requested that Progressive reinvestigate the disputed information and remove him from the incorrect policy.

84.     On or about June 8, 2023, Plaintiff received an email from a Progressive representative that confirmed he was mistakenly added to the incorrect policy and that the error was being corrected.

85.     Plaintiff replied to confirm that he has no connection with this policy ending in 2395 and that his policy is the one ending in 9535.

86.     Sometime in July 2023, Plaintiff stopped seeing the incorrect policy on his Progressive account and he was relieved believing that this ordeal was behind him.

87.     However, in or around December 2023, Plaintiff received a renewal quote from Progressive for his policy for the period from December 2023 to June 2024 and was shocked to find that his rate had again not only increased again but increased substantially.

88.     Progressive quoted Plaintiff at $4,132 for 6 months of coverage. The increase of $829 from the previous 6-month policy and $1,420 increase from the policy before, was shocking to Plaintiff as he had no reason to suspect that his insurance rates were going to skyrocket.  Plaintiff was a very careful and diligent driver and was disappointed to see his efforts fail to prevent an increase in his insurance rates.

89.     Aside from Plaintiff's stellar driving history, the other insured drivers have also not been involved in any accidents or moving violations that could have caused an increase in his insurance rates.

90.     Due to this unjustified increase, Plaintiff decided to solicit different quotes from an online insurance website and directly from State Farm.

91.     Plaintiff continued his search for car insurance, where he was finally able to secure insurance from Allstate for $3,010.78 for 6 months

### Plaintiff Searches for a New Insurance Provider

92.     In or around December 2023, Plaintiff requested a quote from State Farm Insurance, which also quoted Plaintiff at an unreasonably high rate.

93.     Plaintiff was shocked and dismayed at the high cost of the car insurance because Plaintiff and all other insured drivers were safe drivers and have not been involved in any accidents or moving violations.

### Plaintiff's Mixed File as of December 2023

94.     Confused as to why his rates were suddenly rising, Plaintiff asked the State Farm representative why his rate was so high.  The representative informed Plaintiff that the high rate was due to a previous claim made by Plaintiff. The representative suggested Plaintiff file a dispute to correct the inaccurate reporting.

95.     Plaintiff was shocked and disappointed that the claim and inaccurate policy were continuing to be associated with him.

96.     Plaintiff immediately called Progressive's customer service line to request that the error be corrected. Progressive's agent directed Plaintiff to file a dispute with LNRS.

97.     Plaintiff was extremely upset with Defendant Progressive's handling of this issue because he had been a loyal customer for over 14 years.

98.     In or around December 2023, Plaintiff secured a copy of his consumer report from LNRS.

99.     Upon reviewing the contents of the December 2023 LNRS report, Plaintiff was confused by the appearance of several pieces of information that did not belong to Plaintiff at all.

100.    Specifically, LNRS was reporting the following account and claim which did not belong to Plaintiff:

    (a)     Name: Guido Abreu
            Driver's License Number: XXXXX80612930
            Date of Birth: 8/XX/1961
            Gender: Female
            Policy number: 935332359AA092001
            Carrier: Progressive
            Inception Date: 01/14/2020
            CA Start Date: 01/14/2024
            End Date: 07/14/2024
            AMBest Number: 090515

    (b)     Claim Number: 239131335
            Claim Disposition: Closed
            Claim Amount: 25000
            Claim Type: Bodily Injury
            Claim Amount: 8415
            Claim Type: Property Damage
            Make/Model: TOYOTA COROLLA
            VIN: JTDBU4EEXAJ064972
            Model Year: 2010

101.    Further, LNRS was reporting multiple addresses that Plaintiff had never been associated with.

102.    LNRS was reporting other individuals on the policy that Plaintiff had never been associated with.

103.    LNRS was also reporting insurance records associated with addresses neither Plaintiff, his wife, or his sons have never been associated with.

104.    By reporting the aforementioned insurance claims and other personal identifying information in the consumer report presumably about Plaintiff, despite the fact that the insurance claims and information do not belong to Plaintiff or anyone under Plaintiff's insurance plan, LNRS failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's consumer reports, in violation of 15 U.S.C. § 1681e(b).

**Plaintiff Disputes the Inaccurate Reporting with LNRS**

105.    In or around December 2023, worried about the information of another consumer on his LNRS consumer report, Plaintiff disputed the inaccurate information with LNRS. Upon information and belief, Plaintiff disputed via telephone.

106.    Plaintiff disputed the mixed information that was readily identifiable to him on the LNRS report.

107.    Specifically, Plaintiff disputed information that did not belong to him, including the driving records, insurance policies, and insurance claims.

108.    In addition to disputing with LNRS, Plaintiff hired a private investigator to prove that the individual involved in the accident was not Plaintiff so that the inaccurate information would be removed from his report. Plaintiff paid the private investigator approximately $1,470. Plaintiff wanted

109.     The private investigator produced a report to Plaintiff on or around January 5, 2024, which included a copy of the police report for the accident that was being included on Plaintiff's LNRS report. The report identified the driver associated with the accident as an individual named Guido Abreu that had a similar driver's license number to Plaintiff and different date of birth. The individual that was being mixed with Plaintiff also had prior traffic violations and Plaintiff was worried that these records would also be associated with him.

### LNRS' Unreasonable Dispute Reinvestigation

110.     In or around December 2023, Defendant LNRS received Plaintiff's phone dispute and request to remove the mixed information from his consumer report.

111.     Upon information and belief, Defendant LNRS forwarded Plaintiff's dispute to Defendant Progressive.

112.     Defendant LNRS failed to respond to Plaintiff's dispute and failed to adequately review all the information provided to it by Plaintiff.

113.     Defendant LNRS violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the insurance claims history it published and maintained concerning Plaintiff.

114.     Defendant LNRS violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation of Plaintiff's December 2023 dispute, or any reinvestigation whatsoever, to determine whether the disputed information was inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

115.     In or around late January, Plaintiff obtained a copy of his LexisNexis report dated January 24, 2024, to see if Lexis had corrected the report based on his dispute, but the information continued to be reported with no changes.

**Plaintiff's Second Dispute to LNRS**

116.     Accordingly, in or around January 2024, Plaintiff filed a dispute through the LexisNexis online portal.

117.     Plaintiff included all the necessary documentation to support his dispute.

118.     Plaintiff requested that LNRS reinvestigate the disputed information and remove the incorrect information from his report.

**LNRS' Unreasonable Dispute Reinvestigation**

119.     In or around January 2024, Defendant LNRS received Plaintiff's online dispute and request to remove the mixed information from his consumer report.

120.     Upon information and belief, Defendant LNRS forwarded Plaintiff's dispute to Defendant Progressive.

121.     Defendant LNRS failed to respond to Plaintiff's dispute and failed to adequately review all the information provided to it by Plaintiff.

122.     Defendant LNRS violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the insurance claims history it published and maintained concerning Plaintiff.

123.     Defendant LNRS violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation of Plaintiff's January 2024 dispute, or any reinvestigation whatsoever, to determine whether the disputed information was inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

124.     In or around mid-February, Plaintiff obtained a copy of his LexisNexis report dated February 13, 2024, to confirm whether Lexis had corrected the report based on his dispute, but the information continued to be reported with no changes.

**Plaintiff's Third Dispute to LNRS**

125.    On or about March 13, 2024, Plaintiff submitted an online dispute with Defendant LNRS, disputing the inaccuracies for a third time. Plaintiff also copied Defendant Progressive on this dispute.

126.    Plaintiff included all the necessary documentation to support his dispute.

127.    Plaintiff attached the June 8, 2023, email from Progressive in which the Progressive representative acknowledged that this was a merge on their end and that once he is removed from the policy, the merge will disappear.

128.    Plaintiff requested that LNRS reinvestigate the disputed information and remove the incorrect information from his report.

**LNRS' Unreasonable Dispute Reinvestigation**

129.    On or about March 13, 2024, Defendant LNRS received Plaintiff's email dispute and request to remove the missed information from his consumer report.

130.    Upon information and belief, Defendant LNRS forwarded Plaintiff's dispute to Defendant Progressive.

131.    Defendant LNRS failed to respond to Plaintiff's dispute and failed to adequately review all the information provided to it by Plaintiff.

132.    Defendant LNRS violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the insurance claims history it published and maintained concerning Plaintiff.

133.    Defendant LNRS violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation of Plaintiff's March 2024 dispute, or any reinvestigation whatsoever, to determine

whether the disputed information was inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

134.    On or about May 12, 2024, Plaintiff obtained a copy of his LexisNexis report to see if Lexis had corrected the report based on his dispute, but the information continued to be reported with no changes.

### Plaintiff Renews His Insurance at Unfavorable Terms

135.    Plaintiff's Allstate policy was set to expire in June 2024.

136.    Plaintiff was shocked to see an over $1000 increase in his insurance rate for a six-month policy.

137.    Not wanting to pay the steep increase in price but knowing that all of his other options for insurance would likely have even less favorable terms due to LNRS' inaccurate reporting, Plaintiff renewed his policy.

### Plaintiff's Fourth Dispute to LNRS

138.    On Jun 10, 2024, Plaintiff sent a fourth dispute via physical mail to LexisNexis Consumer Center requesting LexisNexis to conduct an investigation and remove all information associated with this policy and claim.

139.    Plaintiff attached all the necessary supporting documents including a copy of his driver's license as well as the police report from the accident that resulted in the inaccurate claim. The letter was delivered On July 18, 2024.

140.    On or about July 27, 2024, LNRS conceded that the records did not belong to Plaintiff and removed it from his report. Despite removing the accident claim from his report, LNRS continued to include personal identifiers from the other consumer on his report, which is very concerning to Plaintiff.

*Guido v. LexisNexis Risk Solutions Inc. et al.*
Second Amended Complaint

141.     As a result of LNRS' conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in the insurance claims of another; loss of ability to purchase and benefit from his good insurance claims history; the expenditure of time and money disputing and trying to correct the inaccurate reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of insurance denials and having another consumer's personally identifying information and insurance information, including insurance claims and driving records, mixed into Plaintiff's file.

### Defendant Progressive's Unreasonable Dispute Investigations

142.     Upon information and belief, Defendant Progressive received Plaintiff's four disputes to Defendant LNRS and failed to adequately review all of the information provided to it by Plaintiff.

143.     Upon information and belief, Defendant Progressive verified the mixed information as accurate in response to Defendant LNRS inquires.

144.     Defendant Progressive violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed information did not belong to Plaintiff.

### Plaintiff Sustained Damages as a Result of Defendants' Inaccurate Reporting

145.     As a result of Defendants' conduct, Plaintiff sustained severe emotional distress. Specifically, Plaintiff has spent an inordinate amount of time, which Plaintiff estimates to be between 60-80 hours, attempting to correct the error resulting in stress and anxiety caused by the false reporting by Defendants.

146.     Plaintiff was anxious and frustrated because he did not know how to correct his LNRS report.

147.     As a result of the "mixed file," LNRS made it practically impossible for Plaintiff to obtain reasonably priced insurance.

148.     As a result of the "mixed file," by LNRS, Plaintiff's Progressive auto Insurance costs were increased every time he wished to renew his policy.

149.     At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the LNRS herein.

150.     At all times pertinent hereto, Defendants' conduct, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

151.     As a standard practice, LNRS does not conduct independent investigations in response to consumer disputes. Instead, it merely parrots the response of the furnisher, despite numerous court decisions admonishing this practice. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp.

2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

152.    Defendants are aware of the shortcomings of their procedures and intentionally chooses not to comply with the FCRA to lower its costs. Accordingly, Defendants' violations of the FCRA are willful.

153.    As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in the insurance claims of another; loss of ability to purchase and benefit from his good insurance claims history; the expenditure of time and money disputing and trying to correct the inaccurate reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of insurance denials and having another consumer's personally identifying information and insurance information, including insurance claims and driving records mixed into Plaintiff's file.

**CLAIMS FOR RELIEF**

**COUNT I**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**
**(First Claim for Relief Against LNRS)**

154.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

155.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

156.    On at least one occasion, LNRS prepared patently false consumer reports concerning Plaintiff.

157.    LNRS mixed another consumer's personal information and insurance claims history into Plaintiff's file, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's insurability.

158.    LNRS violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer reports and insurance claims history files it published and maintained concerning Plaintiff.

159.    As a result of LNRS' conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in insurance claims of another; loss of ability to purchase and benefit from his good insurance claims history; the expenditure of time and money disputing and trying to correct the inaccurate reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of insurance denials and having another consumer's personally identifying

information and insurance information, including insurance claims and driving records, mixed into Plaintiff's file.

160. LNRS' conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, LNRS was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

161. Plaintiff is entitled to recover attorneys' fees and costs from LNRS in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**
**(Second Claim for Relief Against LNRS)**

162. Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

163. The FCRA mandates that LNRS conduct a reasonable reinvestigation of the accuracy of information "[i]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The FCRA imposes a 30-day time limit for the completion of such an investigation. *Id.*

164. The FCRA provides that if LNRS conducts its reinvestigation of disputed information and confirms that the information is, in fact, inaccurate or it is unable to otherwise verify the accuracy of the disputed information, it is required to delete the item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

165.   Plaintiff initiated a dispute with LNRS and disputed inaccurate information reporting in his file and requested that LNRS correct and/or delete the inaccurate, misleading, and highly damaging information belonging to an unrelated consumer.

166.   LNRS failed to respond to Plaintiff's dispute and conducted *no* investigation of Plaintiff's dispute, or such investigation, if any, was so unreasonable as to allow patently false and highly damaging information to remain in Plaintiff's file.

167.   LNRS violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which it received notice of Plaintiff's dispute; and by failing to maintain reasonable procedures with which to filter and verify information in Plaintiff's files.

168.   As a result of LNRS' conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in the insurance claims of another; loss of ability to purchase and benefit from his good insurance claims history; the expenditure of time and money disputing and trying to correct the inaccurate reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of insurance denials and having another consumer's personally identifying information and insurance information, including insurance claims and driving records, mixed into Plaintiff's file.

169.     LNRS' conduct, actions, and inactions was willful, rendering them liable for actual

or statutory damages, and punitive damages in an amount to be determined by the Court pursuant

to 15 U.S.C. § 1681n. Alternatively, LNRS was negligent, entitling Plaintiff to recover under 15

U.S.C. § 1681o.

170.     Plaintiff is entitled to recover attorneys' fees and costs from LNRS in an amount to

be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT III**
**15 U.S.C. § 1681s-2b**
**Failure to Conduct an Investigation of the Disputed Information and Review of all**
**Relevant Information Provided by the Consumer**
**(First Claim for Relief Against Defendant Progressive)**

171.     Plaintiff re-alleges and incorporates by reference the allegations set forth in

preceding paragraphs as if fully stated herein.

172.     Defendant Progressive refused to remove information that belonged to another

consumer.

173.     Defendant Progressive violated 15 U.S.C. § 1681s-2(b) by failing to investigate

Plaintiff's dispute(s), or otherwise by failing to fully and properly investigate Plaintiff's dispute(s),

including but not limited to failing to review all relevant information regarding the same; by failing

to permanently and lawfully correct its own internal records to prevent the re-reporting of the

inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited

to Defendant LNRS; and, by failing to cease furnishing inaccurate information relating to Plaintiff

to the national credit bureaus, including but not limited to Defendant LNRS.

174.     As a result of Defendant Progressive's conduct, action, and inaction, Plaintiff

suffered damages including but not limited to, the loss of his right to keep his private financial

information confidential; the loss of his right to information about who was viewing his private

financial information and how his private financial information was improperly implicated in the insurance claims of another; loss of ability to purchase and benefit from his good insurance claims history; the expenditure of time and money disputing and trying to correct the inaccurate reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of insurance denials and having another consumer's personally identifying information and insurance information, including insurance claims and driving records, mixed into Plaintiff's file.

175.    Defendant Progressive's conduct, actions, and inactions was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, Defendant Progressive was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

176.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant Progressive in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for the following relief:

i.    Determining that Defendants negligently and/or willfully violated the FCRA;

ii.    Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.    Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.    Granting further relief, in law or equity, as this Court may deem appropriate and just.

## **DEMAND FOR JURY TRIAL**

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED this 31st day of December 2024.

**CONSUMER JUSTICE LAW FIRM**

/s/ Catherine Tillman
Catherine Tillman, Esq., FL #0057663
CONSUMER JUSTICE LAW FIRM
8095 N. 85th Way
Scottsdale, AZ 85258
T: (941) 263-7310
F: (480) 613-7733
E: ctillman@consumerjustice.com

*Attorneys for Plaintiff,*
*Guido Antonio Abreu*

*Guido v. LexisNexis Risk Solutions Inc. et al.*
Second Amended Complaint